FILED

2026 Mar-31  PM 06:13
U.S. DISTRICT COURT
N.D. OF ALABAMA

## UNITED STATES DISTRICT COURT
### FOR THE NORTHERN DISTRICT OF ALABAMA
### WESTERN DIVISION

TERRY PERKINS,                  )
                                )
        Plaintiff,              )
                                )
v.                              )   Case No. 7:23-cv-00627-MHH-HNJ
                                )
DR. VEENA DANTHULURI, et al.,   )
                                )
        Defendants.             )

## MEMORANDUM OPINION AND ORDER

In this case, *pro se* prisoner Terry Perkins alleges that the defendants were deliberately indifferent to his serious medical needs, causing him to lose the vision in his right eye. The Magistrate Judge entered a report in which he recommended that the Court treat the defendants' special reports as motions for summary judgment, grant Dr. Danthuluri's motion for summary judgment, and deny Warden Gordy and Warden Hutton's motion for summary judgment on Mr. Perkins's Eighth Amendment and state-law negligence claims. (Doc. 46). Warden Gordy and Warden Hutton have objected to the report. (Doc. 47). The Court has not received objections from Mr. Perkins or Dr. Danthuluri.

A district court "may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1)(C). A district judge must "make a *de novo* determination of those portions of the

1

[magistrate judge's] report or specified proposed findings or recommendations to which objection is made." 28 U.S.C. § 636(b)(1); *see also* Fed. R. Civ. P. 72(b)(3) ("The district judge must determine *de novo* any part of the magistrate judge's disposition that has been properly objective to."). A district court's obligation to "'make a de novo *determination* of those portions of the report or specified proposed findings or recommendations to which objection is made,'" 447 U.S. at 673 (quoting 28 U.S.C. § 636(b)(1)), requires a district judge to "'give *fresh consideration* to those issues to which specific objection has been made by a party,'" 447 U.S. at 675 (quoting House Report No. 94-1609, p. 3 (1976)). *United States v. Raddatz*, 447 U.S. 667 (1980) (emphasis in *Raddatz*).

The wardens' first objection, (Doc. 47, p. 2), seems to be directed to the Magistrate Judge's finding that the wardens are not entitled to qualified or state agent immunity because "prior caselaw demonstrates that the alleged constitutional violation in this case," deliberate indifference to Mr. Perkins's serious medical needs, is "clearly established." (Doc. 46, p. 31; *see* Doc. 46, pp. 31–35).[1] The wardens attempt to distinguish the facts of the cases that the Magistrate Judge cited from the facts in Mr. Perkins's case; the wardens contend that the cases the

---

[1] The wardens' objections are somewhat difficult to decipher. For their first objection, the wardens cite Doc. 46, pp. 32–34. (Doc. 47, p. 2).

Magistrate Judge cited "do[] not involve wardens." (Doc. 47, p. 3) (brackets added). The Court is not persuaded.

The standard that a court must apply to determine whether a constitutional right was clearly established at the time of an alleged constitutional violation is well-settled:

> In analyzing whether a right was clearly established, [a court] consider[s] whether pre-existing law at the time of the alleged acts provided fair warning to Defendants that their actions were unconstitutional. *See Hope v. Pelzer,* 536 U.S. 730, 741, 122 S.Ct. 2508, 153 L.Ed.2d 666 (2002). If it would be clear to any reasonable officer in the same situation that his actions were unconstitutional, then qualified immunity is not available, but if "officers of reasonable competence could disagree on th[e] issue, immunity should be recognized." *Malley v. Briggs,* 475 U.S. 335, 341, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986). The Supreme Court has declared that the test of "clearly established" law cannot apply at a high level of generality; instead, to deny qualified immunity, "the right the official is alleged to have violated must have been 'clearly established' in a more particularized, and hence more relevant, sense." *Anderson v. Creighton,* 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987). Moreover, in applying the "clearly established" test, [a court must] turn to the precedent of the United States Supreme Court, the precedent of [the Eleventh Circuit Court of Appeals], and to the highest court of the relevant state in interpreting and applying the law in similar circumstances.

*Festa v. Santa Rosa Cnty. Fl.*, 413 Fed. Appx. 182, 185 (11th Cir. 2011) (brackets added); *Benning v. Comm'r, Ga. Dep't of Corrections*, 71 F.4th 1324, 1333 (11th Cir. 2023) ("For purposes of qualified immunity, decisions of the Supreme Court, the Eleventh Circuit, or the appropriate state supreme court can announce clearly established law.").

3

The United States Supreme Court addressed the constitutional claim of deliberate indifference to a prisoner's serious medical needs in *Estelle v. Gamble*. Identifying the defendants toward whom a prisoner may direct an Eighth Amendment claim, the Supreme Court stated:

> We therefore conclude that deliberate indifference to serious medical needs of prisoners constitutes the "unnecessary and wanton infliction of pain," *Gregg v. Georgia*, [428 U.S. 153], 173, [] [(1976)] (joint opinion), proscribed by the Eighth Amendment. This is true whether the indifference is manifested by prison doctors in their response to the prisoner's needs or by prison guards in intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed. Regardless of how evidenced, deliberate indifference to a prisoner's serious illness or injury states a cause of action under § 1983.

429 U.S. 97, 104–05 (1976) (brackets added) (footnotes omitted). The Supreme Court remanded the case to the Court of Appeals to apply the standard the Court articulated not only to the doctors who treated the prisoner but also to the warden and other prison officials who presumably delayed or denied access to medical care or interfered with the prisoner's treatment. 429 U.S. at 108.

The Eleventh Circuit has recognized that the *Estelle* holding applies to prison officials. *Farrow v. West*, 320 F.3d 1235, 1243 (11th Cir. 2003); *see Wade v. United States*, 13 F.4th 1217, 1227 (11th Cir. 2021), *cert denied* 142 S.Ct. 1419 (2022) (explaining that a defendant who "ignores a doctor's instructions for treating an injury" is not entitled to a qualified immunity defense); *Young v. City of Augusta, Ga.*, 59 F.3d 1160, 1169 n.17 (11th Cir. 1995) ("The Eighth Amendment prohibits

4

state caretakers from intentionally delaying medical care or knowingly interfering with treatment once prescribed."); *Ancata v. Prison Health Servs., Inc.*, 769 F.2d 700, 704 (11th Cir. 1985) ("Deliberate indifference to serious medical needs is shown when prison officials have prevented an inmate from receiving recommended treatment . . ..") (citation omitted)); *Aldridge v. Montgomery*, 753 F.2d 970, 972 (11th Cir. 1985) (per curiam) (reversing a directed verdict for county officials who failed to give a pre-trial detainee "icepacks and aspirin prescribed by the doctor for pain upon his return to the jail" because "[d]eliberate indifference is shown not only by failure to provide prompt attention to the medical needs of a pre-trial detainee, but also by 'intentionally interfering with the treatment once prescribed'") (quoting *Estelle*, 429 U.S. at 105).  This "preexisting law [i]s so clear that, given the specific facts facing a particular officer, one must say that every reasonable official" who interfered with medical treatment recommended for a prisoner "would have understood that what he is doing violates the Constitutional right at issue." *Gates v. Khokhar*, 884 F.3d 1290, 1302 (11th Cir. 2018) (brackets added) (quotation omitted).

Given this Supreme Court and binding Eleventh Circuit precedent, if Mr. Perkins provides evidence that indicates that the wardens interfered with medical treatment that medical providers recommended to save Mr. Perkins's vision, then the wardens may not avoid liability based on an immunity defense.  Therefore, the

Court overrules the wardens' first objection.

For their next objection, the wardens argue that the information they provided in their affidavits "renders [Mr.] Perkins's testimony incredible." (Doc. 47, p. 5) (brackets added). When considering whether a defendant is entitled to summary judgment, a district court must view the evidence, and draw all reasonable inferences from the evidence, in the light most favorable to the non-movant. *See Feliciano v. City of Miami Beach*, 707 F.3d 1244, 1252 (11th Cir. 2013). Mr. Perkins, the non-moving party, presented sworn, specific facts supporting his version of events. For example, Mr. Perkins asserts that he lost the vision in his right eye. (Doc. 13, p. 5). He contends that he submitted "multiple medical grievances" asking to be sent to a clinic for treatment, and the "Administration refused to send [him] out." (Doc. 13, p. 7) (brackets added). According to Mr. Perkins, the wardens had to authorize the transportation of inmates for medical procedures, and Warden Hutton had "the final say so," causing Warden Hutton to have "the largest responsibility to see to it that" Mr. Perkins attended his eye doctor appointments. (Doc. 13, p. 11). Mr. Perkins alleges that Warden Gordy did not send him "to the clinic for eye surgery which led to [Mr. Perkins] losing vision in [his] right eye." (Doc. 13, p. 12) (brackets added). Mr. Perkins asserts that "Warden Gordy must approve all medical transfer[s]." (Doc. 13, p. 12) (brackets added).

"[C]ourts routinely and properly deny summary judgment on the basis of a

party's sworn testimony." *Sears v. Roberts*, 922 F.3d 1199, 1207 (11th Cir. 2019). In *Scott v. Harris*, 550 U.S. 372 (2007), the Supreme Court recognized an exception to this rule "where a videotape of the incident" at issue "definitively established what happened and what did not" and directly contradicted the plaintiff's version of events. 550 U.S. at 380. The Supreme Court stated: "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." 550 U.S. at 380. The Eleventh Circuit has explained that *Scott* does not apply when the defendants point to their own affidavits and written reports to attempt to identify a blatant contradiction in the evidence. *See Sears*, 922 F.3d at 1208–09; *see also Sears v. Warden Okeechobee Corr. Inst.*, 762 Fed. Appx. 910, 916–17 (11th Cir. 2019) ("[T]he medical records here are not the same as 'incontrovertible' video evidence that courts must accept over contradictory sworn statements, since those records involve people and all their attendant mental infirmities, biases, and limitations-in their creation.").

Here, the wardens point to their affidavits and medical and ADOC records to contradict Mr. Perkins's version of events. (*See* Doc. 35 pp. 3–50; *see also* Doc. 47, pp. 5–6 (objecting to the R&R and arguing that the affidavits and referral requests are sufficient to warrant summary judgment)). Under *Sears*, this evidence is not

7

sufficient to overcome a genuine dispute of material fact. *See Sears*, 922 F.3d at 1208–09.

Moreover, a reasonable juror could find that the set of medical records that the wardens placed in the summary judgment record is not complete. For example, Mr. Perkins asserts that problems with his vision began "around 2021." (Doc. 1, p. 5). A March 2021 Wexford Health record indicates that Mr. Perkins had a "knot" on his eye that was causing blurry vision. (Doc. 35, p. 5). The March 2021 record states: "Refer to provider." (Doc. 35, p. 5). A May 11, 2021 record from an optometrist indicates that Mr. Perkins had cataracts and "probable keratoconus." (Doc. 35, p. 6). "Keratoconus is an eye condition in which the clear, dome-shaped front of the eye, called the cornea, gets thinner, steeper and bulges outward into a cone shape." *Keratoconus*, MAYO CLINIC, https://www.mayoclinic.org/diseases-conditions/keratoconus/symptoms-causes/syc-20351352 (last visited Mar. 31, 2026). "In the early stages of keratoconus, you might be able to correct vision problems with glasses or soft contact lenses. Later, you may have to be fitted with rigid, gas permeable contact lenses or other types of lenses, such as scleral lenses. If your condition gets worse, you may need a cornea transplant." *Keratoconus*, MAYO CLINIC, https://www.mayoclinic.org/diseases-conditions/keratoconus/symptoms-causes/syc-20351352 (last visited Mar. 31, 2026). On May 27, 2021, Mr. Perkins asked to see a doctor because he had swelling from a boil on "the side of [his] face

[in the] right eye area." (Doc. 35, p. 7) (brackets added).  Mr. Perkins wrote:  "I've

prior to this [requested] medical attention immediately.  No response.  I need medical

attention."  (Doc. 35, p. 7) (brackets added).  A Wexford Health record dated July

12, 2021 describes a "3cm growth near right eye" and recommends "Refer to

Provider."  (Doc. 35, p. 13).  The record indicates that the growth was "affecting

vision in right eye" and that Mr. Perkins would be "refer[red] to MD."  (Doc. 35, p.

14) (brackets added).  According to a Wexford Health record dated September 8,

2021, the boil on Mr. Perkins's right temple was emitting foul-smelling drainage.

(Doc. 35, p. 17).  The examining medical professional instructed Mr. Perkins to

"come in am and see provider." (Doc 35, p. 17).

The next document the defendants produced is an off-site referral request to

Lions Eye dated for December 23, 2022, (Doc. 35, p. 18), and the next document

after that is an off-site referral request for an ophthalmology consultation to Callahan

Eye Clinic dated for January 25, 2023,  (Doc. 35, p. 19).  The December 2022 referral

was for follow up on eye disease and to "discuss corneal transplant."  (Doc. 35, p.

18).  The bottom of the form that indicates the date that treatment was authorized is

blank. (Doc. 35, p. 18).  The January 2023 referral request indicates that Mr. Perkins

was experiencing "loss of vision." (Doc. 35, p. 19).  That referral was authorized on

February 6, 2023, and an appointment was made with an outside clinic on March 23,

2023.  (Doc. 35, p. 19).

9

From July 2021 when Mr. Perkins last reported that the growth near his eye was affecting his vision until the jail made a March 23, 2023 appointment with Lion's Clinic, (Doc. 35, pp. 19, 21), 20 months elapsed. As noted, Mr. Perkins asserts in his sworn complaint that he submitted "multiple medical grievances," but the "Administration refused to send [him] out." (Doc. 13, p. 7). Mr. Perkins's May 2021 sick call request is consistent with the allegation in his complaint. (Doc. 35, p. 7). From the substantial gap in the records the defendants produced, a factfinder could credit Mr. Perkins's report that he continually asked for treatment for his right eye, but the jail administration refused to approve his requests. A factfinder also could conclude that in July 2021, medical personnel at the jail recommended that Mr. Perkins be seen by a doctor for the growth that was "affecting vision in [Mr. Perkins's] right eye," (Doc. 35, p. 14) (brackets added), but the jail administrators did not approve a referral until February 2023, (Doc. 35, p. 19), when Mr. Perkins saw Dr. Danthuluri, (Doc. 35, p. 21). The Court overrules the wardens' objection.

The wardens seem to argue that they are not responsible for the delay because Mr. Perkins has not established that they were responsible for approving medical transportation. (Doc. 47, pp. 11–12). As the Magistrate Judge stated:

> [T]he record indicates Perkins's course of treatment sustained several delays. Perkins initially visited Callahan Eye Clinic on March 23, 2023, wherein a physician examined Perkins, ordered a one-month follow-up appointment, and instructed the facility to conduct specific lab testing and send the results back with the patient. (Doc. 35 at 21). However, on or about October 5, 2023, a facility physician observed, "[Perkins]] was

10

last seen at Callahan in March, but was *lost to follow up* after recommendations for surgery for cataract removal. According to the consult notes *this was an option which may have resurrected some vision.*" (Doc. 35 at 37) (emphases added). As a result, the facility physician reportedly resubmitted a referral request from July 2023 for Perkins to see an off-site specialist at Callahan Eye Clinic to receive an "evaluation for possible surgery[] or vision salvage." (Id. at 36; *see also id.* ("Hopefully option for surgery is possible to remove cataract and get some vision back.")). A reasonable inference ensues, based upon Perkins's other allegations, that someone - including, perhaps, the wardens - denied the July 2023 referral request because there exists no evidence Perkins was scheduled to see at off-site specialist at that time.

(Doc. 46, pp. 29–30). Notably, the day after Mr. Perkins saw Dr. Danthuluri, he had a follow-up with Dr. Thomas at the Bibb County Corrections facility, and Dr. Thomas wrote that Dr. Danthuluri diagnosed uveitis. (Doc. 35, p. 22). Uveitis is a form of eye inflammation that affects the middle layer of tissue in the eye, called the uvea. It can cause redness, pain, blurred vision and floaters." *Uveitis*, MAYO CLINIC, https://www.mayoclinic.org/diseases-conditions/uveitis/symptoms-causes/syc-20378734 (last visited Mar. 31, 2026). "Uveitis can be serious, leading to permanent vision loss. Early diagnosis and treatment are important to prevent complications and save your vision." *Uveitis*, MAYO CLINIC, https://www.mayoclinic.org/diseases-conditions/uveitis/symptoms-causes/syc-20378734 (last visited Mar. 31, 2026).

Wardens Gordy and Hutton do not dispute that the Bibb County Corrections administration is responsible for transporting prisoners to off-site medical appointments, and the wardens do not dispute that they have final decision-making

11

authority over off-site transportation of prisoners housed at Bibb.  (*See* Doc. 47; *see also* Doc. 28-1, pp. 2–3; Doc. 28-2, p. 3).  Given the delay in treatment and the failure "*to follow up* after recommendations for surgery for cataract removal," a reasonable factfinder could conclude that the wardens did not comply with medical providers' treatment recommendations.

The wardens contend that Mr. Perkins did not need to be transported for surgery because "[t]here is no record of an operation being scheduled." (Doc. 47, p. 15).  The 2021 record regarding a possible cornea transplant, the lack of medical records between September 2021 and December 2022, Mr. Perkins's sworn statements, and the October 2023 record's reference to an earlier recommendation of cataract removal suggests that either Mr. Perkins was not allowed to see the doctors who would have scheduled a surgery, or Mr. Perkins was refused surgery that was recommended for him.

The wardens argue that "'the Administration' could refer to YesCare and not the wardens…." (Doc. 47, p. 15).  At this stage, the Court must draw reasonable inferences in Mr. Perkins' favor.  The wardens do not dispute that "the Administration" could refer to them.  (*See* Doc. 47).  In his September 19, 2023, amended complaint, Mr. Perkins contends that he filed a grievance with the "Medical Grievance Administrator" in which he claimed "[t]hat the medical refuse to send me to clinic." (Doc. 13, p. 7).  The response Mr. Perkins received from the

nurses indicates "that the Administration refused to send [him] out."  (Doc. 13, p. 7).  A reasonable factfinder could conclude that "the Administration" referred to Wardens Gordy and Hutton.

After careful consideration of the record in this case, the Magistrate Judge's report, and the wardens' objections, the Court adopts the report and grants Dr. Danthuluri's motion for summary judgment, (Doc. 43).  The Court denies Wardens Gordy and Hutton's motion for summary judgment, (Doc. 28).  The Clerk of Court shall please terminate Dr. Danthuluri as a defendant in this action.  The Court refers Mr. Perkins's claims against defendants Warden Gordy and Warden Hutton to the Magistrate Judge for further proceedings.

**DONE** and **ORDERED** this March 31, 2026.

_____
**MADELINE HUGHES HAIKALA**
UNITED STATES DISTRICT JUDGE